John Hayhurst v. ARTHREX, 2012-12-65 Mr. Skenyon, we're ready when you are. May it please the court, this is a suture-anchored case where the district court adopted a new claim construction on JMOL and overturned a jury verdict. The specific issue here on direct infringement relates to two claim constructions, lodging and resiles. The lodging construction was one that this court adopted in the Ethicon case earlier, that was back in 1999, I believe. That construction of lodging was used in this case in the first trial and the second trial and in the appeal from the second trial. In the appeal from the second trial, which was an appeal by ARTHREX for the judgment of infringement, they only raised the issue of the construction of resiles, the other claim construction. And this court determined that that construction, resiles, should mean that the anchors themselves must have sufficient resilience to cause them to lodge in the bone. Now I have a sample of the anchor here, one that was used at trial. This is a bio-suture-tac anchor, and it's a plastic thing standing right at the end of the driver. This is a bio-suture-tac anchor, it's a 3.0 millimeter anchor, but that's what we're dealing with. Most of them look fairly similar, but the design of some are different. What's the fishing rod? The fishing rod actually is the driver of which the... Do they stick that in you? They stick just the tip of it through the bone. What happens if you've got to go down fairly deep? Well, you don't usually have to because the cortical layer is only very thin, even on a very healthy bone. So they don't have to go very deep. They've already peeled you open is the idea? Well, actually this is usually done in shoulder surgery, otoscopically. So that's the beauty of the invention, is that before this, the surgeon had to go in, make a big incision here, peel back muscle, drill holes through the bone, and then wrap the suture around the tissue that had come away from the bone, and then reseal the patient up. And that was a very painful process, a long recovery time. The advantage of this invention was that it let somebody do it otoscopically, where you just make a little incision, you just drill it right through the hole in the bone, which is a little smaller than the anchor, and you tap the anchor in, and then you remove it, and that gives you... The anchor is inside the bone, and the suture is sticking out. And the string is the thing you tug on. The suture is the string. So is the appellate correct when they refer to forces of surgery as always being essentially the same? No, that wouldn't be so. When I looked at it, I thought, well, gee, there could be different kinds of surgery here. There are. There are a great number of surgeries that these anchors are used for. The one example we have in our brief is shoulder surgery, because that's how Dr. Hadros came up with it. He was trying to do that initially, and that's how he came up with it. But basically, these anchors are used for a variety of surgeries. They come in a variety of sizes. In some surgeries, such as the shoulder surgery, three anchors are used. It's not just one. Other surgeries that might be finger surgeries, you're using a smaller anchor. And so basically, on that basis alone, it's very hard to come up with forces of surgery one size fit all forces of surgery. Right. But in terms of- Where does that take us? The fact that there may be varying degrees of forces to withstand in surgery? I'm puzzled, because on the claim construction that the judge struck, and then he said, well, there's no reason we could find that there was any sufficient evidence in the record to show that the infringing devices withstand this test. You're not arguing that if we accept the claim construction on the JMOL that you want a new trial on whether the devices meet the forces, right? Normally, the answer to that would be yes. But in this case, I think the answer is no, because there was evidence of what the forces of surgery should be that the court disregarded. What he did was, he said, well, let me adopt this construction, forces of surgery construction here on JMOL. And let's say that the resilience of the anchor must be such that it not only just lodges the anchor in the bone initially, but it must now survive all the forces of surgery to which that anchor might be subjected in any individual surgery. And that didn't go before the jury, did it? It did not. And there's a number. I mean, there was a specific number, 12-6 or 12-7. The 12-6 number is picked out of the air by Arthrex. What we tested was, as part of our testing for this last retrial, we tested how much force in general would be associated with tying down the tissue here. And we did 30 tests. And the average was between 7 and 9 pounds. The 12.6 pounds they relied on is a single artifact from a single test of one of these 30s. It's the highest number they could seize on. So there was testimony by our doctor, Dr. Dedock, that probably in general, when you're dealing with tying down the surgery, tying down the knot during surgery, it might be subjected to that 7 to 9 pound range here. And so if you wanted to deal with forces of surgery here and make that a requirement, which we think is incorrect, if you want to make that a requirement, then let's look at what our test evidence was. So putting aside the first issue on claim construction, the legal issue of infringement, we go to the fact issue of infringement. What we proved at trial was that their anchors were resilient. Their resilience was such that it held the anchor in the bone and that for each anchor was a little bit different. The results were different. But on average, the lowest holding force for an anchor was over 9 pounds. This particular anchor here, the bio suture tact, had averages of about 15 pounds, which means that the resilience of this anchor alone supports 15 pounds of force. So on that basis here, there was evidence in the record accepted by the jury. It had to have been accepted by the jury. It was not only accepted by the jury finding direct infringement, but it had to be accepted by the district court because the district court denied J. Maul for the construction that went to the jury that didn't have the forces of surgery were sentenced in it. So our test evidence showed that even if you considered forces of surgery, and the testimony was from 7 to 9 pounds, is that every single one of these tests for these four anchors showed that the resilience of the anchor provided more holding force than that. If you relied on the 12.6 artifact here, three of the four anchors provided more holding power due to resilience than that. Only one did not, and that was the peak suture tact anchor. So even if that construction was accepted, the judge was absolutely wrong in granting J. Maul of non-infringement as to three of four of the anchors if you accepted forces of surgery, if you accepted that value of 12.6 pounds as measuring forces of surgery. So from the point of view of where the posture of the case was, not factually, but where the posture of the case was, what we were dealing with below was this court's construction of lodging, which the court pre-instructed the jury on, which we opened on, which our trial graphics reproduced, which we dealt with with our expert witnesses to prove infringement, and which we used to prove infringement for each of the four accused anchors. We used the court's revised definition of resiles to make that proof. We rest. We cross-examined their principle witness of non-infringement witness using the same construction, and in fact, using some of their evidence, which included as reproduced on What's the earliest point in time that you were aware of the forces of surgery interpretation for lodging? There's two answers to that. And I know you know about it at the time the case is about to go to trial, but what's the earliest you knew? The first time they ever raised that term was in February of 2011 in their rebuttal expert reports for the third trial. It doesn't appear in their Markman briefs. It doesn't appear at the first trial. It doesn't appear at the second trial. It surely doesn't appear in the last appeal in this case, which involved the issue of lodging. And it didn't appear in their summary judgment brief on remand. It doesn't appear in their expert reports, the principal expert reports for the last case. That's the first place it appears, but not as a claim construction. It was an argument they were raising on the second trial. So the evidence that was put in on sort of resiles and the force isn't really focusing on forces in surgery, right? That's correct. So there's a disconnect between the, whether you want to call it the seven to nine or the 12.6. Is there not a disconnect between that and the claim construction that the judge finally put on on the JMA? I don't think so. The reason is that when we were trying to prove infringement based on this court's construction of lodging, and this court's construction of resiles. Resiles, not lodging. Both, they're interrelated because the resilience resiles means that the- Causes to lodge. Has to be sufficient to lodge the anchor. But what that meant was that we had to do a series of tests to show, well, wait a second. Let's put the tests we've done. We know what the amount of holding power these anchors have due to resilience alone. Let's put this in context. When the anchors first put in, what kind of forces is it subjected to? And we did those tests, which as I mentioned, that's a 30 different tests. And they showed that when it's first pushed in, it goes up to about two to three and a half pounds might be asserted on a suture. And then when you start- The force to put it in. No, that's the force that would be subjected to once you put it in. Going the other way. The force to put it in is, that's different. This is the force that we're talking about, the force to make it lodge, which means whether it can come out. And in that regard, what happened was that when we did a test, it showed how much force was on this up until the time we actually tied the knot. I see that. I can see the clock time. There's an alternative ground here that the trial judge said that you're going to lose on indirect infringement because no jury could find that Arthrex was willfully blind as to knowing that there was infringement. That's correct. In that case, what the judge did was substitute his view for the jury's view of the evidence. The judge at Arthrex Insistent instructed the jury as to inducement and to contribute or infringement under the global tech standard. And the jury came back with infringement verdicts under both. Judging the evidence, looking at the witnesses, and concluding that even if the requirement is willful blindness, they were willfully blind. They knew about the patent, did nothing except write instructions that matched up with the instruments and the anchors following those instructions. When suit gets filed later, the first thing they do is run and try to test for resilience, something they completely avoided beforehand. That's a little synopsis of what that evidence was. But the jury, seeing the witnesses, made that credibility determination and weighed that evidence. It consumed most of your rebuttal time, but we'll give you two minutes back. Thank you, Your Honor. Mr. Saber. Thank you, Your Honors. As Judge Clevenger noted, there were two independent grounds upon which the judge granted the JAMAL, both the direct infringement issues that go into this whole lodging question, as well as the indirect infringement. So if we prevail under either, then affirming the JAMAL is the appropriate answer. Prior to the trial here, it was abundantly clear that the parties had a very different understanding of the term lodging, which, of course, had first been construed in the Ethicon case. So this isn't a question of changing constructions. This is a question of understanding of what had already been. We had this force of the surgery. I'm still not sure exactly what Smith and Nephew think. But the judge didn't instruct the jury in forces of surgery, did he? That's correct. That's correct. That's changing the ground rules. Let me tell you what happened, if I could, Your Honor. When we came back on the remand here, Smith and Nephew in their expert reports then introduced, they're the ones who introduced this, we have to have a way of quantifying how much force it takes to lodge. And they came up with this, what I call this middle of knot tying thing. Oh, that's how much force you need to lodge. We were frankly astounded that they did this because we thought it was so clear from what had happened in the Ethicon case and what had happened in this case. That when a lodged anchor has to stay in the bow, my God, that's what the construction said. It says it may not be removed. You can have these other forces that may or may not make it better, but it said once pressed in the hole, it may not be removed. Frankly, we thought that was so clear. Of course, it has to stay in the bow. The anchor can't work if it doesn't stay in the bow. We thought that was very, very clear. But when Smith and Nephew came up with this new theory after the remand from here, that's when we were forced to come in and say, hey, wait a second, they got it wrong from day one going back to the Ethicon case. It's clear what this court has always meant is that a lodged anchor has to withstand the forces of surgery. It only makes sense. It's what this court said in Ethicon. It said the anchor may not be removed once pressed into the hole, made it clear that nothing other than that pressing would keep it in the hole. This court then talked about the surgeon's tug, as you may remember. They said, well, the reason why you do a surgeon's tug is to test to make sure the anchor is seated. Well, the evidence is undisputed that a surgeon's tug is done to make sure the anchor will survive the forces of surgery. And what pressures were associated with the surgeon's tug? Do we know? Yes. Yes. The evidence in this case, it was a little different in the last trial, but in this case, it was 12.7 pounds, which is very, very similar to the 12.6 that Dr. Didak, their own expert test, came up with. All very, very consistent that those were the forces in surgery. So we believe, and still believe, that the- Just tell me quickly, how does the judge decide on the Jamal that there can't possibly be an infringement on the forces of surgery interpretation? Okay. Why was the evidence in front of the court- Right. On the evidence in front of the court, which is exactly what he did, at the end of the And the parties agreed on that. We needed to clear that up. The judge said to Mr. Skanyon, he says, Mr. Skanyon, if I give the forces of surgery, which I think is correct, you've got nothing to argue. You don't have any evidence to prove it. And Mr. Skanyon, he kind of quibbled with that, but what the judge said and what Mr. Skanyon said was, what he said, well, you have little or nothing left. And he said, that's right, Your Honor. I have little or nothing. Now, let's talk about the evidence. There's a short answer and there's a long answer. The short answer, the really easy answer, is what is Mr. Skanyon's code to the anchor. The undisputed evidence in this case is that the parties made metal replicas of this anchor, which everyone agrees doesn't use resilience at all, and those all lodge just fine. And so we believe that on that basis alone, one can and should conclude that the 557 patent, which is a patent that is all about using resilience, just simply you don't infringe when you design an anchor that can lodge without resilience. That's question one. The longer answer, and I apologize for the longer answer. Again, I need to start with Dr. Hayes, their own expert. He said, let's quantify the forces of lodging. Now, they used that low number. That's true because they had this view of lodging that we think is entirely wrong. But they also put in the evidence, their own evidence, on what the forces of surgery were that the anchor had to withstand. So that's step one. Step two then was to then compare these comparative push-out tests between metal and plastic. And they said, well, there's more force on the metal, which was sometimes true and sometimes not true. The tests were all over the place. In fact, in 2010, 17 out of the 20 tests from their own expert showed that that simply wasn't true. But that's what they tried to do. They tried to show the difference. And what were the forces that they showed? They only had one test that they put in that showed something more than the forces of surgery under the criteria that their own expert said was correct. What was the number? That was 15.6. But Dr. Hayes admitted unequivocally that that was a statistically insignificant number. And of course, the reason why this is underlying, getting into the details of the record, was because the results that he was averaging were all over the place. And that's why under a proper statistical analysis, and again, the evidence is undisputed, that when you have statistical insignificance, it's like a tie. So they didn't have any evidence. And that's why the judge said what the judge said. That's why Mr. Skinion agreed. What's the seven to nine he's talking about? There was a dispute as to what the appropriate number is on the forces of surgery. We believe that there really should be 12 because of 12.6, which is one of the numbers that Dr. Didak found in his own test. Because you're not going to design an anchor just to withstand the forces of surgery all the time. Of course, you have to design an anchor that's going to withstand the forces of surgery every time. And that's why we think that that's appropriate. Though I will say it's a little bit of a red herring issue because our position would be the same whether it's nine or whether it's 12.6. Because they only had that one test that was statistically insignificant. So that surgeon's tug of 12.6 pounds, surgeon does that when she implants an anchor in the knuckle as well? Same thing, same force of tug with a much smaller anchor? It could be less on different surgeries. That's true. And Smith and Nephew certainly could have tried the case that way. They could have said, okay, there are different kinds of surgeries. But that didn't get raised to come in front of the jury. No, no one raised that. How Smith and Nephew decided to try the case is they used a representative anchor for shoulder surgery. They didn't try to show these other kinds of things. If they had, we would have had different kinds of evidence that came in. And, of course, the comparative push-out test would then have had to have been with the smaller anchors, which they never did. They only used the 3.0 anchor to do their push-out test. So that's the only thing that we have to compare it to. The last thing I'd like to say on this point is that they do try to use these 2008 tests. And we go through why that's inappropriate. Dr. Hayes changed his criteria. When he got his really bad result in 2010, when he went back to try and beat this court's construction, because now he had to do that, he did these tests and they were disastrous. So he said, oh, I'll do a different kind of test. I'll change my criteria. But the one thing he can't do, and he said this very, very clearly. He said no test is valid unless you measure the outer diameter of the plastic anchors and the metal anchors. Now, here's the rub. 2008, when he wasn't applying this test, he never did that. He didn't think it was important then. So he doesn't know, no one knows, whether the anchors were the appropriate size to each other. So under Dr. Hayes' own view of what a test should be, it simply is not sufficient evidence. This is what the judge heard at the trial. We had a judge who, frankly, sat through three trials here. But he heard all this evidence at the trial, and he got it. He got it when he said at the end of the trial, you don't have anything. I'm going to give the wrong construction because, frankly, Smith and Nephew, your evidence is so bad. It's so bad, I think even under your construction, you're going to lose. I wish that had turned out to be true, but it didn't. But he said, listen, I know you just don't have anything under the right construction. You've known about it. It's, frankly, what it's always meant. So I'm likely to- That's what I'm curious. Did they know about the forces of surgery, clamp construction, and time if they wanted to, to go and develop evidence to show whether or not your devices met that limitation? They exactly had that evidence, Your Honor. It's their own evidence. They did the test on the forces of surgery. They did the comparative test. On the forces of surgery or on resiling? They did both. They did both. Why would they have done tests on forces of surgery before the claim construction theory was ever advanced? Well, I suspect because, I mean, there's no evidence to do that, so all I can do is give you my best speculation, is because they knew about the Ethicon case. They knew about what this court had done in the first Arthrex appeal. They knew that everyone always had understood that. On your alternative ground, Mr. Scannion says that the district court judge impermissibly strapped himself into the fact finder seat on the question of whether there was willful blindness as to the question of actual infringement. Yes. How do you defend J. Maul on that issue? Well, I think Mr. Scannion, while there was perhaps a little bit of putting it his own way, he actually hit on the operative undisputed facts. When we learned about the patent, we didn't do a test. That's correct. And he says we should have done a test. That's his argument. But what's important and critical in the evidence, again, on this is undisputed at trial, undisputed evidence, is that there was no allegation of infringement. Now, we know from global tech now that you have to show not just knowledge of the patent. You also have to have knowledge that the direct infringer's acts constitute infringement. It's a direct quote from the case. No doubt about that. And that second prong can be met either by actual knowledge, no evidence of that, or willful blindness. Willful blindness is an extraordinarily high standard the Supreme Court told us. It's not negligence. It's not recklessness. It's such a high degree that you buried your head in the sand, and you had no reason to believe that you're going to try and find out the answer. Here, there's no allegation of infringement made. Just think about this for a moment. By that, you mean no allegation that they knew of the infringement? There was no allegation made to Arthrex from Smith and Adams. They're telling you that you were infringing. That's true. That's right, nothing. And here's why that's so critical. Just think, companies like Arthrex look at hundreds and hundreds of patents, if not thousands of patents every year. If that were the standard for willful blindness, it would mean that companies like Arthrex or every company in America would have to be doing on its own testing all of their products hundreds and hundreds of times in the off chance they might get an allegation of infringement. That, Your Honor, just can't be the law, nor is there any support for that. So that's the answer. There certainly can't be anything, or should have done a test. There's no allegation of infringement. God knows the testimony from the witnesses was when we designed this, and you've got to remember, they had used this lodging method for years before on a different product, but this isn't a resilient anchor. We don't use a resilient anchor. One of the inventors came on and said, it can't be a resilient anchor because it wouldn't work. Now maybe that's right, maybe that's not right, but it's the subjective intent of the inventors, and it's undisputed. Because to establish willful blindness, the Supreme Court said, you have to have the subjective intent of a high probability, and you have to take deliberate actions not to find out. So they don't have it. So in 2004, they filed a lawsuit. What's the first thing we do when we have the allegation? We do a test, and what does the test show? No resilience. That's what we knew. That's the undisputed evidence, and we've been defending, of course, on that basis ever since. God knows this is a closed case. God knows we have a reasonable case. God knows as— I think God's belief is irrelevant here. True, I agree. But when this court said in a very similar case, in the Vitamix case, they said there's no indirect infringement when you had a reasonable belief that your instructions don't infringe. That's, of course, the situation here. It's the undisputed evidence. Judge Mossman, when he granted this, he told us. He said, you know, I don't know if I've ever done this before. If it is, it's been very, very rare. We've taken it away from the jury. But I have to do it here because there just is not the evidence under the proper legal standard. And, Your Honor, that's why I believe that on indirect infringement, we're also entitled to have the jail upheld. Thank you very much. Thank you, Mr. Saber. Mr. Skenyon has a couple of minutes or two minutes. Let me just quickly respond to a couple of things. First, the reference that Mr. Saber made to my comments at trial, if you look at the transcript, it didn't refer to the test evidence that we did having no evidence that would support the verdict under the forces of surgery. It dealt with the fact that we had not tested for forces of surgery because that construction had never been raised before in this case. Mr. Saber did not point you to one instance where that had been raised in this case. I'll tell you where the first time it comes. It comes when they submitted a paper. So is Mr. Saber wrong? He just said a minute ago that you hadn't tested for forces of surgery. No, we weren't testing for forces of surgery. What we were testing was just to see what forces the anchor would be subjected to up through the not tying process. We weren't testing for forces of surgery. That's what the test was for. The fact that those forces could be forces of surgery, that was not what we were looking at. But Mr. Saber, his first time that we deal with new constructions are what they submitted on the sixth day of trial. Why were you testing for forces up to the connection? Just to see what they would be because as a practical matter, to be conservative here, we know that while it's going to be tied, we have to see what the forces are going to be on that up until that point so that we can measure our test evidence against that. As far as the test evidence goes, everything Mr. – So what you're saying is that you were doing the test to get that number even though you didn't call it forces of surgery? We didn't call it forces of surgery because I don't believe it necessarily is forces of surgery, but one of the witnesses referred to it, this could be what would measure forces of surgery, 7 to 9 pounds. And what were those numbers? 7 to 9 pounds. And did the accused device meet those numbers? Yes, every one of their anchors exceeds that. And the characterization Mr. Saber gave about our test evidence, every single one of those attacks on it was presented in the Dalbert motion that the court denied and presented to the jury, which the jury rejected. So he wishes you to sit here and re-judge the evidence and re-weigh the evidence and credibility of the witnesses. The jury accepted those test results, finding infringement. The district court accepted it. Denying jail meant well on the construction that went to the jury. Just one final point if I may. The tensioning step or anything that occurs after the pressing step is not and cannot be part of lodging the member. Those are not my words. That's what they told this court in the last appeal. The tensioning step has nothing to do with lodging. One reference. They were saying lodging and lodged. Forced to put it in and forced to keep it from being pulled out. And it's lodged that finally shows up. It all starts in Epicon. It finally gets concluded in this case. In terms of holding power, there's a difference in holding power and lodging because lodging is only introduced during prosecution to distinguish a piece of prior art. But one final point I want to make is this. During the trial here, the judge said the following things. It says, this is at 18906. It says, one is that lodging occurs upon the anchor being pressed into the bone hole and we determine whether lodging has occurred at that point, not later. You agree with that, don't you? Absolutely, says Mr. Saber. I'm assuming you do, addressing it to me. I do, Your Honor. Lodging is measured when it's put in. And the tests show that this, that's when you measure it. That's what the claim construction should be. And basically, that's what the jury found, in fact, and the court should have not have reversed it. Thank you. Mr. Stenyan will take the case under advisement.